**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

────────────────────────────────

MICHAEL D.,

                              Plaintiff,

              v.

COMMISSIONER OF SOCIAL SECURITY,                    No. 3:22-CV-104
                                                    (CFH)

                              Defendant.

────────────────────────────────

**APPEARANCES:**                          **OF COUNSEL:**

Law Offices of Kenneth Hiller, PLLC       KENNETH R. HILLER, ESQ.
6000 North Bailey Avenue – Suite 1A
Amherst, New York 14226
Attorney for plaintiff

Social Security Administration            HUGH DUN RAPPAPORT, ESQ.
6401 Security Boulevard
Baltimore, Maryland 21235
Attorney for defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### MEMORANDUM-DECISION AND ORDER[1]

Michael D.[2] ("plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking

review of a decision by the Commissioner of Social Security ("the Commissioner")

denying his application for disability insurance benefits.  See Dkt. No. 1 ("Compl.").

---

[1] Parties consented to direct review of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, L.R. 72.2(b), and General Order 18.  See Dkt. No. 6.
[2] In accordance with guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in 2018 to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify plaintiff's last name by initial only.

Plaintiff moves for judgment on the pleadings and for the Commissioner's decision to be reversed and remanded for further proceedings.  See Dkt. No. 11.  The Commissioner also moves for judgment on the pleadings.  See Dkt. No. 13.  For the following reasons, the Commissioner's decision is affirmed, plaintiff's motion is denied, and the Commissioner's motion is granted.

## I. Background

On February 2, 2016, plaintiff filed a Title II application for disability insurance benefits.  See T. at 52, 126-27.[3]  Plaintiff alleged a disability onset date of March 21, 2015.  See id. at 52, 126.  The Social Security Administration ("SSA") denied plaintiff's claims on July 1, 2016.  See id. at 65.  Plaintiff requested a hearing, see id. at 74-75, and a hearing was held before Administrative Law Judge ("ALJ") Bruce S. Fein on May 8, 2018.  See id. at 24-51.  On June 14, 2018, the ALJ issued an unfavorable decision. See id. at 10-19.  On March 23, 2019, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  See id. at 1-4.  Plaintiff sought review of the Commissioner's decision by filing a complaint in this Court, and the Court reversed and remanded the Commissioner's decision for further proceedings.  Michael F. D. v. Saul, No. 3:19-CV-00600 (BKS), 2020 WL 5742704, at *1 (N.D.N.Y. Sept. 25, 2020).

On remand, ALJ Fein held hearings on April 8, 2021, and August 3, 2021.  See T. at 382-418.  On October 12, 2021, the ALJ issued an unfavorable decision.  See id.

---

[3] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. See Dkt. No. 10.  Citations to the administrative transcript refer to the pagination in the bottom, right-hand corner of the page, not the pagination generated by CM/ECF.

at 357-70.  Plaintiff did not appeal the denial to the Appeals Council, but he timely brought this action before the Court.  See Dkt. No. 1.


## II.  Legal Standards

### A. Standard of Review

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1388(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied or it was not supported by substantial evidence.  See Johnson v. Bowen, 817 F.2d 983, 985-86 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).  The substantial evidence standard is "a very deferential standard of review . . . .  [This] means once an ALJ finds facts, we can reject [them] only if a reasonable factfinder would have to conclude otherwise."  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (citation, emphasis, and internal quotations marks omitted).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion is arguably supported by substantial evidence.

See Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson, 817 F.2d at 986).  However, if the correct legal standards were applied and the ALJ's finding is supported by substantial evidence, such finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

### B. Determination of Disability

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ."  42 U.S.C. § 423(a)(1)(E).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  Id. § 423(d)(1)(A).  A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  See id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based on objective medical facts, diagnoses[,] or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his [or her] physical or mental ability to do basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.
>
> Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added).  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further."  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  See DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. (citing Berry, 675 F.2d at 467).

### III. The ALJ's Five Step Disability Evaluation

Applying the five-step disability sequential evaluation, the ALJ first determined that plaintiff had "not engage[d] in substantial gainful activity during the period of his alleged onset date of March 21, 2015[,] through his date last insured of September 30, 2021[.]"  T. at 360.  At step two, the ALJ found that plaintiff "had the following severe impairment: bipolar disorder[.]"  Id.  At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See id. at 361.  Before reaching step four, the ALJ concluded that plaintiff retained the residual functional capacity ("RFC")

> to perform a full range of work at all exertional levels.  Mentally, [plaintiff] could perform simple, routine, repetitive tasks, but no production-rate or pace work.  He could occasionally interact with coworkers and supervisors but could not interact with the public.  He also required a low stress job, which is defined as one involving only occasional decision-making, changes in the work setting, and use of judgment required on the job.

Id. at 364.  At step four, the ALJ determined that plaintiff was unable to perform past relevant work.  See id. at 368.  At step five, "considering [plaintiff's] age, education, work experience, and residual functional capacity," the ALJ determined that "there were jobs that existed in significant numbers in the national economy that [plaintiff] could have performed[.]"  Id. at 369.  Thus, the ALJ determined that plaintiff "was not under a disability, as defined in the Social Security Act, at any time from March 21, 2015, the alleged onset date, through September 30, 2021, the date last insured[.]"  Id. at 370.

### IV.  Discussion

### A.  Parties' Arguments

Plaintiff argues that the ALJ erred by failing to enforce a subpoena to obtain medical records from plaintiff's treating provider, Brian Babiak, M.D.  See Dkt. No. 11-1 at 14.  Plaintiff contends that by failing to enforce the subpoena, there was a gap in the record that leaves the ALJ's decision unsupported by substantial evidence.  See id. Plaintiff also asserts that the ALJ's decision is not supported by substantial evidence because the ALJ failed to give Dr. Babiak's medical opinion controlling weight, "ignore[d] the level of psychotropic medication that [p]laintiff was on[,]" "inappropriately held [p]laintiff's attempts to find and maintain some employment against him[,]" ignored the side effects from plaintiff's medication, and gave the medical expert, Ira Hymoff, Ph.D.'s testimony too much weight.  Id. at 16-19.

Defendant "agree[s] that the Absent Records might have shed light on the issue of whether [p]laintiff was disabled during the pertinent period."  Dkt. No. 13 at 3. However, defendant asserts that plaintiff has not shown that the ALJ failed to take additional steps to obtain the records and that plaintiff suffered prejudice.  See id. at 4. Defendant also contends that the ALJ's decision is supported by substantial evidence. See id. at 7-13.

### B.  Dr. Babiak's Treatment Records

"Given the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, an ALJ has an affirmative duty, even if the claimant is represented by counsel, to develop the medical record if it is incomplete."  Stacy D. v. Comm'r of Soc. Sec., 358 F. Supp. 3d 197, 205 (N.D.N.Y. 2019) (citing Tejada v. Apfel,

167 F.3d 770, 774 (2d Cir. 1999)).  "[T]he duty of an ALJ to develop the record is particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations." Id. (quotation marks omitted) (citation omitted).  "The ALJ's duty to develop the record is enhanced when the disability in question is a psychiatric impairment." Corporan v. Comm'r of Soc. Sec., No. 12-CV-6704 (JPO), 2015 WL 321832, at *22 (S.D.N.Y. Jan. 23, 2015) (citation omitted). "Failure to re-contact [a treating source can be] error." Hamilton v. Colvin, 8 F. Supp. 3d 232, 241 (N.D.N.Y. 2013) (citation omitted).

However, there is not "a limitless duty to develop the record on [the p]laintiff's behalf[.]" Alice K. v. Kijakazi, No. 3:21-CV-1147 (DJS), 2023 WL 1420638, at *3 (N.D.N.Y. Jan. 30, 2023) (citation and quotations marks omitted).  "[A] treating source need not be re-contacted when it is known that the source either cannot or will not provide the necessary information." Stratton v. Colvin, 51 F. Supp. 3d 212, 217 (N.D.N.Y. 2014) (citing 20 C.F.R. §§ 404.1512(e), 416.912(e)).  The ALJ must "make '[e]very reasonable effort' to obtain medical evidence, which is defined as an initial request and 'one follow-up request to obtain the medical evidence[.]'" Robert T. v. Comm'r of Soc. Sec., No. 6:20-CV-1121 (ATB), 2022 WL 1689549, at *9 (N.D.N.Y. May 26, 2022); see also 20 C.F.R. § 404.1512(b)(1)(i) ("We will make every reasonable effort to help you get medical evidence from your own medical sources and entities that maintain your medical sources' evidence when you give us permission to request the reports.  [] Every reasonable effort means that we will make an initial request for evidence from your medical source or entity that maintains your medical source's evidence, and, at any time between 10 and 20 calendar days after the initial request, if

the evidence has not been received, we will make one follow-up request to obtain the medical evidence necessary to make a determination.").

Under 20 C.F.R. § 404.1520b(b)(2), if the evidence in the record is insufficient, the SSA "will determine the best way to resolve the inconsistency or insufficiency." 20 C.F.R. § 404.1520b(b)(2). "The action(s) [the SSA] take[s] will depend on the nature of the inconsistency or insufficiency. [The SSA] will try to resolve the inconsistency or insufficiency by taking any one or more of the actions listed in paragraphs (b)(2)(i) through (b)(2)(iv) of this section. [The SSA] might not take all of the actions listed below." Id. The possible actions include the following:

> (i) [The SSA] may recontact [the claimant's] medical source. [The SSA] may choose not to seek additional evidence or clarification from a medical source if [the SSA] know[s] from experience that the source either cannot or will not provide the necessary evidence. If [the SSA] obtain[s] medical evidence over the telephone, [the SSA] will send the telephone report to the source for review, signature, and return;

> (ii) [The SSA] may request additional existing evidence;

> (iii) [The SSA] may ask [the claimant] to undergo a consultative examination at our expense . . .; or

> (iv) [The SSA] may ask [the claimant] or others for more information.

Id. § 404.1520(b)(2)(i)-(iv).

Under 20 C.F.R. § 404.950(d), "[w]hen it is reasonably necessary for the full presentation of a case, an administrative law judge . . . may, on his or her own initiative or at the request of a party, issue subpoenas . . . for the production of [] records . . . ." "[T]he plain language of [20 C.F.R. § 404.950(d)] clearly places the decision to issue a subpoena within the sound discretion of the ALJ." Sarah S. v. Kijakazi, No. 5:20-CV-1005 (DJS), 2022 WL 913095, at *3 (N.D.N.Y. Mar. 29, 2022) (quoting Yancey v. Apfel,

145 F.3d 106, 111 (2d Cir. 1998)); see also Cathy G. v. Kijakazi, No. 1:21-CV-823 (ATB), 2022 WL 11134065, at *8 (N.D.N.Y. Oct. 19, 2022) (citations and quotation marks omitted) ("[T]he Second Circuit has explained that the decision to issue a subpoena is within the sound discretion of the ALJ[.]"); Johnson v. Comm'r of Soc. Sec., No. 19-CV-1576 (KAM), 2021 WL 308284, at *5 (E.D.N.Y. Jan. 29, 2021) ("An ALJ has discretionary power in issuing and enforcing subpoenas.").

The SSA requested medical records from Dr. Babiak on four separate occasions in 2016.  See T. at 56, 235, 240.  During plaintiff's 2018 hearing, ALJ Fein noted that the SSA had requested the evidence four times and had not received any records, and plaintiff's attorney stated that he had also requested records and left messages for Dr. Babiak to no avail.  See id. at 41.  During the April 8, 2021, hearing, plaintiff's counsel requested a postponement so that Dr. Babiak's records could be obtained.  See id. at 385.  The ALJ granted the postponement and stated that he would issue a subpoena. See id. at 386.  Dr. Babiak then submitted a medical opinion on May 11, 2021.  See id. at 714.  During the August 3, 2021, hearing, plaintiff's counsel explained that although he received Dr. Babiak's medical opinion, he had not received any treatment records. See id. at 391.  Plaintiff's attorneys had requested treatment records from Dr. Babiak numerous times.  See id. at 187, 604 693, 698, 702.  Plaintiff testified that he personally asked Dr. Babiak for the records.  See id. at 395-96.  The ALJ stated that he would issue the subpoena and hold the record open to give plaintiff time to obtain Dr. Babiak's treatment records.  See id. at 396-97, 416.  The ALJ issued the subpoena on August 25, 2021.  See id. at 608-10.  Dr. Babiak never submitted any treatment records and the ALJ made his unfavorable decision on October 12, 2021.  See id. at 367, 370.

The SSA and the ALJ made extensive efforts between 2016 and 2021 to obtain treatment records from Dr. Babiak that easily surpass the "reasonable" threshold.  See T. at 56, 235, 240, 608-10; see, e.g., Travo, 2020 WL 3888003, at *5 (concluding that the ALJ made every reasonable effort to obtain records by issuing a subpoena and contacting the medical provider); Desane v. Colvin, No. 3:15-CV-50 (GTS), 2015 WL 7748877, at *5 (N.D.N.Y. Nov. 30, 2015) (concluding that the ALJ made every reasonable effort where the ALJ held the record open and contacted counsel to check on status of records); Robert T., 2022 WL 1689549, at *8-9 (concluding the same when the SSA sought missing records, the ALJ issued a subpoena, the provider responded to the subpoena by producing the only record it had, and the ALJ detailed these efforts in her decision).  The ALJ cannot be faulted for Dr. Babiak's apparent refusal to produce the records that were repeatedly requested.  See Stratton, 51 F. Supp. 3d at 217; see also Travo, 2020 WL 3888003, at *5.  Plaintiff does not provide any case law to demonstrate that the SSA's and the ALJ's actions were insufficient to meet the ALJ's duty to develop the record.  See Dkt. No. 11-1 at 14.  As the ALJ made every reasonable effort to obtain the missing treatment notes and complete the record, it cannot be said that he failed to develop the record.  Thus, remand is not warranted on this ground.

## C. Whether the ALJ Appropriately Discounted Dr. Babiak's Opinion

Plaintiff argues that the ALJ failed to give Dr. Babiak's medical opinion controlling weight and failed to provide appropriate reasons for doing so.  See Dkt. No. 11-1 at 16-18.  The Commissioner argues that the ALJ properly discounted Dr. Babiak's opinion.  See Dkt. No. 13 at 7.

### 1. Treating Physician Rule, Dr. Babiak's Opinion, and the ALJ's Decision

For claims filed on or before March 27, 2017, the treating physician rule, codified in 20 C.F.R. § 404.1527, applies.  See Schillo v. Kijakazi, 31 F.4th 64, 70 (2d Cir. 2022). The treating physician rule "require[s] the ALJ to treat the opinions of treating physicians as controlling, 'so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Rucker v. Kijakazi, 48 F.4th 86, 92 (2d Cir. 2022) (quoting Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019)).  "In the event the ALJ determine[s] that the opinion should not be treated as controlling, and should instead be assigned a lower weight, the rule further require[s] that the ALJ articulate 'good reasons' for each decision." Id. (citation omitted).  When determining what weight, other than controlling weight, to give to a treating physician's opinion, "[t]he governing regulations require an ALJ to explicitly consider . . . : '(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" Schillo, 31 F.4th at 75 (citation omitted); see also 20 C.F.R. § 404.1527(c).  "[T]he regulations require the ALJ to give 'good reasons'—i.e., reasons supported by substantial evidence in the record—for the weight she affords the treating source's medical opinion." Schillo, 31 F.4th at 75 (citation omitted); see also 20 C.F.R. § 404.1527(c)(2).

Dr. Babiak completed a medical source statement in May 2021.  See T. at 710-14.  In his opinion, he noted that he saw plaintiff "every month or two" from April 29, 2015, to April 12, 2018.  Id. at 710.  Plaintiff was then seen by another provider until

April 20, 2020, when he returned to Dr. Babiak, who saw plaintiff five times between April 20, 2020, and May 11, 2021.  See id.  Dr. Babiak indicated that plaintiff had severe bipolar disorder with psychotic features and tardive dyskinesia.[4]  See id.  He listed the five medications that plaintiff was taking and stated that plaintiff experienced dizziness, drowsiness, and abnormal movements of his tongue and face as side effects.  See id.

Dr. Babiak wrote his "clinical findings": "Patient has paramania, suicidality [and] depression, panic attacks, sleepless [and] agitated; unable to work or interact with public; failure to perform Activities [of] Daily Living[.]"  T. at 710.  He stated that plaintiff's prognosis was poor.  See id.  The medical source statement instructed Dr. Babiak to indicate plaintiff's ability to do certain work-related tasks and to rank those abilities on a scale from "Unlimited or Very Good"; "Limited by satisfactory"; "Seriously limited"; "Unable to meet competitive standards"; or "No useful ability to function[.]"  Id. at 712-13.  Dr. Babiak indicated that plaintiff had "[n]o useful ability to function" in every single category except for four categories, in which he indicated that plaintiff would be "[u]nable to meet competitive standards."  Id. at 712-13.  Dr. Babiak opined that plaintiff would miss more than four days of work per month.  See id. at 714.

---

[4] Tardive dyskinesia is a neurological movement disorder that is caused by the long term use of a certain type of medications prescribed for psychiatric conditions.  Tardive dyskinesia is primarily characterized by repetitive involuntary movements of the jaw, lips and tongue such as grimacing; sticking out the tongue; and smacking, puckering and pursing the lips.  Some affected people may also experience involuntary rapid, jerking movements (chorea) or slow, writhing movements (athetosis) of the arms and/or legs.

Selimaj v. Comm'r of Soc. Sec., No. 17-CV-3389 (KMK/PED), 2018 WL 8608356, at *10, n.5 (S.D.N.Y. May 4, 2018) (citing Tardive Dyskinesia, National Institute of Neurological Disorders and Stroke (April 2014), available at https://www.ninds.nih.gov/Disorders/All-Disorders/Tardive-Dyskinesia-Information-Page)), report and recommendation adopted, 2019 WL 1417050 (S.D.N.Y. Mar. 29, 2019).

In reviewing Dr. Babiak's opinion, the ALJ acknowledged that Dr. Babiak was plaintiff's treating psychiatrist but did "not find his opinions entitled to controlling weight." T. at 367.  ALJ Fein first "note[d] that Dr. Babiak's opinions are not supported by any clinical notes, even though they have been repeatedly requested and subpoenaed[.]" Id. (citation omitted).  The ALJ continued, "[h]owever, even if I were to assume Dr. Babiak's records contain evidence supporting his opinions, the extreme level of limitation he has proposed is inconsistent with all the other evidence in the record."  Id. (citation omitted).  ALJ Fein explained that plaintiff's mental health treatment was primarily outpatient aside from "only one brief hospitalization in 2016 during which he actively participated in his treatment program, including group psychotherapy, and improved with a change in medication[.]"  Id. (citing T. at 243-68).  The ALJ noted that plaintiff saw Dr. Babiak approximately once a month until February 2018, and when he resumed therapy in 2020, he saw Dr. Babiak five times in one year.  See id.  The ALJ concluded that this "level of care appears disproportionate to the level of limitation Dr. Babiak has reported."  Id.  "Notably, in the same assessment that Dr. Babiak gave [plaintiff] Global Assessment of Functioning (GAF) scale scores of 20-25 and opined that he had no useful ability to function in most areas, he also indicated that [plaintiff] was capable of managing benefits in his own best interest[.]"  Id. (citing T. at 708-14).

Next, the ALJ stated that Dr. Babiak's opined limitations were "inconsistent with the other [] medical opinions, clinical findings and reported activities."  T. at 367.  ALJ Fein stated, "the available medical evidence documents mostly negative clinical findings and [plaintiff] remained relatively active during the relevant period.  Again, [plaintiff] indicated in his April 2016 function report that he needed no special help or reminders to

14

take medication or tend to his personal needs and grooming[.]"  Id. (citing T. at 154).

Plaintiff "also reported that he could follow instructions, complete tasks and had no

problems getting along with other people, including authority figures[.]  [Plaintiff]

indicated that he lived with his wife and son[.]  He claimed he took care of his son and

picked him up from karate, and prepared 'easy' meals[.]"  T. at 367.  Plaintiff also

"performed household chores with reminders, shopped in stores and online, drove and

rode a bicycle, could go out alone, handled money, did some beekeeping in the

summer, and interacted with others both in person and via text[.]"  Id. (citing T. at 152-

59).  The ALJ explained that plaintiff told the psychiatric consultative examiner, Sara

Long, Ph.D., "that he took care of his own grooming, cooked, cleaned, did laundry,

shopped, and was 'taking care of his ill mother'"; and "[h]e described his socialization

and family relationships as 'good' and claimed his hobby was 'bee keeping[.]'"  Id.

(quoting T. at 229).  ALJ Fein also recounted plaintiff's statement to the internal

medicine consultative examiner Gilbert Jenouri, M.D., "that he cooked three times a

week, cleaned and did laundry twice a week, shopped once a week, showered three

times a week, and dressed and provided childcare every day[.]"  Id. (citing T. at 231).

The ALJ noted that plaintiff watched T.V., listened to the radio, socialized with friends,

worked as a home health aide until July 2016, "and reportedly looked for work in late

2019, 2020, and early 2021[.]"  Id. (citing T. at 185-86, 189, 405-406).  ALJ Fein

concluded that "[t]hese activities would not be possible if [plaintiff] was as limited as Dr.

Babiak's assessment suggests[.]"  Id. at 367-68.

    The ALJ found "no basis for adopting Dr. Babiak's assessment of [plaintiff's]

ability to maintain attendance.  While Dr. Hymoff thought [plaintiff's] impairments might

cause some absences he offered no opinion as to frequency and admitted that such a limitation was hard to estimate[.]" T. at 368 (citing T. at 402). The ALJ stated that "[r]ecurrent absences are not consistent with [plaintiff's] largely normal mental status exams or reported activities. Nor are they supported by [plaintiff's] treatment records, since they do not provide evidence of [plaintiff] repeatedly missing or arriving late for his scheduled appointments." Id. Finally, ALJ Fein afforded Dr. Babiak's assessment "little weight. This includes [plaintiff's] aforementioned GAF score." Id. The ALJ then explained that GAF scores do not represent a longitudinal picture of plaintiff's mental functioning and that Dr. Babiak's GAF score was "clearly inconsistent with all the other evidence of [plaintiff's] functioning." Id.

## 2. Supportability

Plaintiff argues that the ALJ did not provide good reasons for giving Dr. Babiak's opinion less than controlling weight. See Dkt. No. 11-1 at 15-16. Plaintiff first contends that the ALJ erred by discounting Dr. Babiak's opinion because he did not provide his treatment records. See id. at 14.[5] One factor that the ALJ is required to consider in determining the weight to afford to medical opinions is "supportability." 20 C.F.R. § 404.1527(c)(3). "Supportability" means "[t]he more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight [the ALJ] will give that medical opinion. The better an explanation a source provides . . ., the more weight [the ALJ] will give that medical opinion." Id. The ALJ accurately stated that because Dr. Babiak did not provide any

---

[5] Plaintiff makes this argument in a single heading of his brief, stating, "[t]he ALJ improperly relied on the absence of Dr. Babiak's treatment records to reject his disability-supporting opinion." Dkt. No. 11-1 at 14. Plaintiff also reiterates the ALJ's statements concerning the lack of treatment records. See id. at 16. Plaintiff does not otherwise develop the argument.

treatment records, his opinion was left unsupported.  See T. at 367; see also Allen v.
Comm'r of Soc. Sec., No. 1:16-CV-00273 (MAT), 2017 WL 604421, at *3 (W.D.N.Y.
Feb. 15, 2017) (finding no error in the ALJ's comment that the provider "failed to provide
'longitudinal history of records of treatment, though [the p]laintiff reportedly participated
in monthly counseling since 2011[]'" where the SSA requested the records but none
were produced).

Further, Dr. Babiak did not include any narrative explanations for his opinion.
See 20 C.F.R. § 404.1527(c)(2) ("The better an explanation a source provides for a
medical opinion, the more weight we will give that medical opinion.").  As there were no
treatment notes or explanations provided to support the opinion, the ALJ appropriately
determined that Dr. Babiak's opinion was unsupported.  This was one good reason to
discount the opinion.  See Dereu v. Saul, No. 19-CV-0164L, 2020 WL 5250507, at *3
(W.D.N.Y. Sept. 3, 2020) ("[A]n ALJ may not reject a medical opinion out of hand simply
because it appears on a checkbox form, [but] a lack of supportive clinical findings in any
medical opinion – a deficiency to which checkbox forms are particularly vulnerable – is
relevant to the ALJ's weighing of that opinion.").

### 3. Conservative Treatment

Plaintiff asserts that "[t]he ALJ's reliance on the treatment regimen that Dr.
Babiak prescribed to find that Dr. Babiak overstated [p]laintiff's limitations also seems to
ignore the level of psychotropic medication that [p]laintiff was on."  Dkt. No. 11-1 at 17.
The ALJ mentioned plaintiff taking medication numerous times in his decision.  See T.
at 362-63, 365-67.  He did not, however, list the exact medications plaintiff was taking or
what each medication was for.  See id. at 362-67.

The Second Circuit has instructed that "the opinion of the treating physician" should not "be discounted merely because he [or she] has recommended a conservative treatment regimen." Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (citing Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000) (concluding that the district court erred in ruling that the treating physician's "recommend[ation of] only conservative physical therapy, hot packs, EMG testing—not surgery or prescription drugs—[w]as substantial evidence that [the claimant] was not physically disabled")); see also Abate v. Comm'r of Soc. Sec., No. 18-CV-2040 (JS), 2020 WL 2113322, at *4 (E.D.N.Y. May 4, 2020) (citations omitted) (second and third alteration in original) ("[T]o the extent the ALJ's finding that the 'record shows that the [plaintiff] underwent some therapy but discontinued and only saw her psychiatri[st] monthly,' can be construed as discounting [the] opinion as 'conservative,' that is 'not a "good reason" to reject a treating physician's medical opinion.'"); Molina v. Kijakazi, No. 21-CV-3869 (JLC), 2022 WL 16946823, at *10 (S.D.N.Y. Nov. 15, 2022) ("In citing [the plaintiff's] conservative treatment regime, the ALJ relied in part on what this Circuit has found to be 'not a good reason' for assigning limited weight to a medical opinion."); Rivera v. Comm'r of the Soc. Sec. Admin., No. 19-CV-4630 (LJL/BCM), 2020 WL 8167136, at *15 (S.D.N.Y. Dec. 30, 2020) ("As to the consultative examiners . . . the ALJ rejected their views that plaintiff had 'marked' limitations in mental functioning as inconsistent with 'the conservative nature of care' and the 'repeated normal mental status examination in evaluation notes' but neither explanation is borne out by the record.  In addition to counseling, [the] plaintiff was treated with a battery of powerful psychoactive drugs, in various combinations, including Abilify, Adderall, Klonopin, gabapentin, Prozac,

Seroquel, Suboxone, and Wellbutrin.  As [the] plaintiff explained at the hearing (and as the treatment notes confirm), he was prescribed 'five or six' of these drugs at any one time, with frequent adjustments, and side effects, including grogginess observable on examination.  While this regimen may be less aggressive than inpatient treatment, it is not inherently inconsistent with the presence of 'marked' functional limitations, nor a basis for rejecting the opinions of both consultative examiners who identified such limitations."), report and recommendation adopted, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021).

However, "[i]n the context of a medical opinion, courts have found substantial evidence to support an ALJ's decision to discount an opinion where the opinion was 'not supported by the . . . treatment progress notes[,] which show that the claimant's condition was stable from conservative treatment with medication and therapy.'" Thomas v. Comm'r of Soc. Sec. Admin., 479 F. Supp. 3d 66, 89-90 (S.D.N.Y. 2020) (quoting Callanan v. Astrue, No. 10-CV-1717 (NGG/ALC) 2011 WL 589906, at *4 (E.D.N.Y. Feb. 10, 2011)); see also Selimaj v. Berryhill, No. 17-CV-3389 (KMK), 2019 WL 1417050, at *9 (S.D.N.Y. Mar. 29, 2019) (citations omitted) (alterations in original) (explaining that in the context of reviewing the plaintiff's subjective complaints, "'[c]onservative treatment' has been characterized as 'medication but not hospitalization,' which would indicate that Dr. Charles' prescription of Haldol was a conservative treatment as opposed to a more aggressive treatment.  Although it is true that an ALJ 'may not impose [her] . . . notion[ ] that the severity of a[n] . . . impairment directly correlates with the intrusiveness of the medical treatment ordered,' it is evident here that the ALJ considered [the p]laintiff's treatment collectively with the other

evidence in the record."); <u>Angela M. K. v. Comm'r of Soc. Sec.</u>, No. 5:21-CV-451
(BKS/TWD), 2022 WL 4129308, at *7 (N.D.N.Y. Sept. 12, 2022) (explaining that in the
context of a step-two determination, "substantial evidence supports the ALJ's finding
that 'a conservative course of treatment of therapy and medication management . . .
controlled [the p]laintiff's symptoms.' . . . [The p]laintiff's healthcare providers treated
these impairments with medication and therapy.  Treatment records from the relevant
time period indicate [the p]laintiff's medications successfully controlled her symptoms."),
<u>report and recommendation adopted</u>, 2022 WL 4591844 (N.D.N.Y. Sept. 30, 2022).

    First, the ALJ did not discount Dr. Babiak's opinion solely because plaintiff's
"level of care appears disproportionate to the level of limitation Dr. Babiak has reported."
T. at 367.  The ALJ also relied on other medical opinions, treatment notes, and plaintiff's
testimony and activities of daily living.  <u>See id.</u> at 365-68.  The ALJ relied on this
information to conclude that Dr. Babiak's opinion was "inconsistent with all the other
evidence in the record."  <u>Id.</u> at 367.  The ALJ is not required to give controlling weight to
a treating physician's opinion when the opinion is inconsistent with the record.  <u>See</u> 20
C.F.R. § 404.1527(c)(2).  The ALJ also acknowledged the treating relationship and how
often plaintiff met with Dr. Babiak.  <u>See</u> T. at 367; <u>see also</u> 20 C.F.R. § 404.1527(c)(1)-
(2).  Second, the ALJ discussed all aspects of plaintiff's treatment history.  The ALJ
acknowledged that plaintiff was hospitalized in 2016.  <u>See id.</u> at 363, 365, 367.  Earlier
in his decision, the ALJ reiterated D. Brown, Psy.D.'s opinion that as long as plaintiff
"remained medicated, retained the ability to perform the basic demands of unskilled
work and some semi-skilled work on a sustained basis[.]"  <u>Id.</u> at 365 (citing T. at 53-64).
He also reiterated Dr. Hymoff's testimony that plaintiff's treatment was primarily

outpatient. <u>See</u> <u>id.</u> at 367. Dr. Hymoff explained that "usually when you have someone with a bipolar condition, they're, they have to be followed on a regular basis because usually . . . the essential treatment is getting the right medication management." <u>Id.</u> at 401. Based on the available records, Dr. Hymoff concluded that plaintiff's bipolar disorder "was managed on an outpatient basis[,]" did not meet a Listing, and plaintiff would be able to tolerate a low-stress job with additional limitations. <u>Id.</u> at 400-401. The treatment records indicate that plaintiff's bipolar disorder was well-controlled with medication following a number of medication changes. <u>See</u> <u>id.</u> at 273, 282, 346, 349, 351. Thus, the Court finds no error in the ALJ's reliance on, among other things, plaintiff's relatively conservative treatment as a reason to discount Dr. Babiak's extremely limiting medical opinion is. <u>See</u> <u>id.</u> at 367, 712-14; <u>see</u> <u>also</u> <u>Angela M. K.</u>, 2022 WL 4129308, at *7; <u>Selimaj</u>, 2019 WL 1417050, at *9; <u>Thomas</u>, 479 F. Supp. 3d at 89-90.2.

**4. Medication Side Effects**

Plaintiff asserts that "[t]he ALJ also gave no consideration whatsoever to Dr. Babiak's statements regarding the side effects that [p]laintiff would experience due to his medications." Dkt. No. 11-1 at 18. "An ALJ [] need not explicitly discuss a claimant's medication or its side effects in his or her decision, so long as the 'decision or record indicate[s] that the ALJ considered the issue.'" <u>Wilson v. Colvin</u>, No. 14-CV-5666 (DF), 2015 WL 5786451, at *29 (S.D.N.Y. Sept. 29, 2015) (quoting <u>Rockwood v. Astrue</u>, 614 F. Supp. 2d 252, 282 (N.D.N.Y. 2009)) (concluding that "this was not a situation where the plaintiff had testified that she was not experiencing side effects, or was no longer taking medication that had previously caused side effects. As the record in this

case reflected that [the p]laintiff was claiming ongoing side effects, the ALJ, while not required to address the alleged side effects in his decision, at least needed to make clear that he had considered them in making his determination."). Further, "[a]n ALJ can decline to give controlling weight to a treating physician's opinion where contemporaneous treatment records, including the [plaintiff's] largely normal mental status examinations on both treating and consultative evaluations, did not support such severe limitations." Figueroa v. Saul, No. 18-CV-4534 (JLC), 2019 WL 4740619, at *28 (S.D.N.Y. Sept. 27, 2019) (citation omitted) (explaining that treatment notes showed improvement and stabilization of mental status with medication and no side effects from those medications; and concluding that the ALJ did not err where "the record does not support the severity of the restrictions assessed by [the treating provider], and thus, the ALJ was not required to give his opinion controlling weight."). Finally, "[a]n ALJ does not have to state on the record every reason justifying a decision," and "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted.'" Brault, 683 F.3d at 448 (citation omitted).

In his opinion, Dr. Babiak wrote that plaintiff experienced dizziness, drowsiness, and abnormal movements of his tongue and face because of his medications. See T. at 710. During his 2018 hearing, plaintiff testified that he was not experiencing any side effects from his medications. See id. at 40. During his 2021 hearing, the only side effect he mentioned was tardive dyskinesia which caused "weird muscle spasms [] in [his] arms and legs and [his] jaw and [his] tongue rolls around in [his] mouth all day." Id. at 414-15. Plaintiff testified that it was caused by taking Latuda and that he had since stopped taking Latuda but still experienced the spasms. See id. at 414. He explained

that the "only precaution [he] take[s] is with [his] food.  [He] make[s] sure [his] food is in small pieces so [he] can chew it and not choke."  Id. at 415.  The record reflects that at various points in plaintiff's treatment history, his medications did cause certain side effects: Remeron caused facial paralysis; Seroquel, Lamictal, and Zoloft caused him to be manic; Wellbutrin was ineffective; Risperdal caused itching; Depakote caused kidney issues; and mirtazapine because it caused right side facial twitching.  See id. at 284 299, 346.  However, plaintiff stopped taking these medications and plaintiff does not identify any records that indicate he suffered other side effects from his medication regimen other than the tardive dyskinesia.  See id. at 284, 299, 346-47; see also Dkt. No. 11-1 at 18.  Rather, most of the treatment records do not indicate that plaintiff was experiencing any side effects.  See T. at 193-94, 197-98, 201-203, 205, 207, 209-10, 214, 223, 231, 253, 271-74, 278, 290, 294, 302, 307, 316, 325, 333, 348-53.

In the ALJ's decision, he did not mention Dr. Babiak's notation concerning dizziness and drowsiness.  See T. at 357-70.  However, plaintiff does not identify any records to support that plaintiff experienced those side effects and that the ALJ did not mention Dr. Babiak's notation does not mean he did not consider the side effects.  See Brault, 683 F.3d at 448; see also Dkt. No. 11-1 at 18.  The ALJ did explicitly consider plaintiff's tardive dyskinesia at step two of the decision.  See T. at. 361.  The ALJ concluded that although plaintiff was assessed for right-sided facial twitching, Dr. Babiak noted the abnormal movements in his opinion, and plaintiff testified to them, "the record does not show that this condition imposed more than minimal work-related limitations during the relevant period."  Id.  The ALJ noted that plaintiff "did not even mention this condition during his initial hearing in 2018 or during his August 2021

hearing."  Id.; see also T. at 299.  Contrary to the ALJ's statement, plaintiff did mention his tardive dyskinesia during the August 2021 hearing, but plaintiff does not directly challenge the ALJ's conclusion concerning the side effect.  See generally Dkt. No. 11-1.

Although the ALJ did not discuss Dr. Babiak's statement concerning medication side effects in determining plaintiff's RFC, the Court finds no error as the record does not demonstrate that plaintiff was suffering from side effects that impacted his ability to do full-time work.  This is not a circumstance where a plaintiff testified to or there are treatment records reflecting persistent side effects that the ALJ ignored.  See Rockwood, 614 F. Supp. 2d at 282 ("[T]estimony, as well as other substantial evidence in the record, supports the ALJ's determination not to incorporate side effects from medication in [the p]laintiff's RFC because, it indicates that when [the p]laintiff experienced negative side effects she stopped taking the associated medication.  [The p]laintiff's own testimony indicates that the pain medication and muscle relaxants she continued to take did not have any side effects."); Whittaker v. Comm'r of Soc. Sec., No. 2:18-CV-02697 (AMD), 2020 WL 2933863, at *5 (E.D.N.Y. June 2, 2020) ("[T]he ALJ discussed the plaintiff's limited testimony about her medication, and the record does not include any evidence that suggests that the plaintiff's medication affected her ability to function.").  But see Richard A.D. v. Comm'r of Soc. Sec., No. 1:20-CV-1154 (DNH/DEP), 2022 WL 508744, at *6 (N.D.N.Y. Feb. 2, 2022) (explaining that the plaintiff testified that his medication makes him extremely tired and dizzy and impacts his concentration and that there were treatment notes which reflected the plaintiff's reports of tiredness or trouble concentrating; and "[a]lthough there is certainly not any clear objective medical evidence to support [the] plaintiff's allegations of side effects, the

ALJ's complete failure to acknowledge [the] plaintiff's reports or to reconcile the portions of the record that were unclear as identified above suggests error in that it is not clear that the ALJ appropriately considered [the] plaintiff's reports of side effects that impact his work-related functioning."), report and recommendation adopted, 2022 WL 507346 (N.D.N.Y. Feb. 18, 2022); Robert S. v. Comm'r of Soc. Sec., No. 3:18-CV-357 (ATB), 2019 WL 4463497, at *12 (N.D.N.Y. Sept. 18, 2019) ("The ALJ's decision does not mention that the 2013, 2014, and 2017 medical source statements and treatment notes of the four treating physicians document that [the p]laintiff was being treated with various medications over time, including opioids; that those medications had not controlled his chronic pain; and that he suffered side effects from his medications, including nausea, drowsiness, dizziness, confusion, decreased concentration, and balance problems.").  As there is no evidence that plaintiff suffered side effects from his medications that cause him to be more limited than the ALJ determined, the Court denies plaintiff's motion on this ground.

### 4. Searching for Work and Activities of Daily Living

Plaintiff argues that the ALJ inappropriately relied on plaintiff searching for and performing part time work and his other activities of daily living to discount Dr. Babiak's opinion.  See Dkt. No. 11-1 at 17-18.  Plaintiff is correct that engaging in or searching for part-time work does not equate to a finding that a plaintiff is able to perform full-time work.  See Dkt. No. 11-1 at 17-18; see also Olejniczak v. Colvin, 180 F. Supp. 3d 224, 229 (W.D.N.Y. 2016) (remanding because "[t]he only 'reason' given by the ALJ for discounting [the] opinion was that as of October 2011, [the] plaintiff 'was looking for a new job,' and that she subsequently obtained a part-time job. . . .  The ALJ focused on

the fact that [the] plaintiff was looking for part-time work, but ignored [the [provider's] simultaneous notes that she was still experiencing similar anxiety symptoms consistent with her diagnosis.  The treatment notes upon which the ALJ relied, which noted that [the] plaintiff was looking for part-time work but continued to experience symptoms related to her panic disorder, thus failed to substantially contradict [the] opinion as the ALJ found."); Maria S. v. Kijakazi, No. 3:21-CV-0177 (DEP), 2022 WL 4619861, at *8 (N.D.N.Y. Sept. 30, 2022) ("As to the ALJ's citation to [the] plaintiff's ability to work during early 2020, plaintiff is correct that such evidence of part-time work does not necessarily mean that [the] plaintiff can work full-time.")

However, the ALJ did not conclude that because plaintiff performed or searched for part-time work, he could work full-time.  ALJ Fein instead concluded that Dr. Babiak's opined limitations were not supported by the record, including plaintiff's testimony that he worked part time in 2016[6] and searched for work in 2019, 2020, and 2021.  See T. at 367-68; see also Maria S., 2022 WL 4619861, at *8 ("[S]uch a finding was not the ALJ's purpose in highlighting her work ability.  Rather, the ALJ noted that [the] plaintiff's reports of an ability to work as a waitress three days per week for five or six hours per day is inconsistent with [the] opinion that plaintiff cannot stand or walk for any amount of time in an eight-hour workday.").  For example, Dr. Babiak concluded that plaintiff had no useful ability to deal with stress, get along with co-workers or peers, sustain an ordinary routine, and understand very short and simple instructions.  See id. at 712-13.  During his 2018 hearing, plaintiff testified that as part of various part-time jobs he performed, he had to interact with others, set up equipment, and install and

---

[6] Plaintiff stopped working in 2016 when he was hospitalized.  See T. at 33-34.

repair HVAC units.  See id. at 31-36.  The ALJ's rationale in referencing plaintiff's
search for and performance of part-time work is clear—if plaintiff was as limited as Dr.
Babiak opined, he would not have been able to perform certain part-time work because
he would not have been able to, for example, interact with his coworkers.  See id. at 31,
35, 713.  As the ALJ did not rely solely on plaintiff's part-time work to discount Dr.
Babiak's opinion, the Court finds no error on this ground.  Cf. Pollino v. Comm'r of Soc.
Sec., 366 F. Supp. 3d 428, 440 (W.D.N.Y. 2019) ("The ALJ specifically found that [the
p]laintiff did not engage in substantial gainful work activity during the period at issue.
However, the ALJ explained that [the p]laintiff's ability to perform part-time work
contradicted his testimony regarding the severity of his impairments and his report that
no one would hire him 'because of his history.'  It was proper for the ALJ to consider
[the p]laintiff's part-time work in this context."); House v. Comm'r of Soc. Sec., 32 F.
Supp. 3d 138, 154 (N.D.N.Y. 2012) (citing 20 C.F.R. §§ 404.1571, 416.971 (stating that
even though part-time work does not constitute substantial gainful activity, it may show
that a claimant is able to do more work than actually performed)) ("[T]he ALJ's
consideration of [the p]laintiff's part-time work was entirely proper and supported his
decision to discount [the p]laintiff's credibility.").

Next, as to plaintiff's activities of daily living, "it is well-settled that the
performance of basic daily activities does not necessarily contradict allegations of
disability, 'as people should not be penalized for enduring the pain of their disability in
order to care for themselves.'"  Stoesser v. Comm'r of Soc. Sec., No. 08-CV-643
(GLS/VEB), 2011 WL 381949, at *7 (N.D.N.Y. Jan. 19, 2011) (quoting Woodford v.
Apfel, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000)), report and recommendation adopted,

2011 WL 381941 (N.D.N.Y. Feb. 3, 2011).  However, the ALJ is entitled to consider a plaintiff's activities of daily living as part of his RFC analysis.  See Sarah S., 2022 WL 913095, at *7 (concluding that "[t]he ALJ's reliance on [the p]laintiff's own testimony contained throughout the record" concerning her activities of daily living "were reasonable considerations with respect to Plaintiff's limitations in a work environment.").

ALJ Fein did not conclude that because plaintiff could engage in certain activities, he could perform full-time work.  See T. at 367.  Rather, he concluded that "[t]he level of limitation proposed by Dr. Babiak is also inconsistent with . . . reported activities."  Id. The ALJ noted that plaintiff did not need reminders to take medication or to tend to personal needs and grooming; plaintiff reported that he could follow instructions, complete tasks, and get along with others; and he took care of his son, prepared easy meals, shopped in stores and online, did household chores, handled money, and interacted with others.  See id.  The ALJ also reiterated plaintiff's reports to the consultative examiners that he cooked, cleaned, shopped, took care of his mother, provided childcare to his son, and socialized with his friends.  See id.  The ALJ stated that "[t]hese activities would not be possible if [plaintiff] was as limited as Dr. Babiak's assessment suggests."  Id. at 367-68.

The ALJ's conclusion on this issue is supported by substantial evidence.  For example, Dr. Babiak opined that plaintiff had no useful ability to understand and remember very short and simple instructions, maintain socially appropriate behavior, or adhere to basic standards of neatness and cleanliness.  See T. at 712-13.  Yet, in his Function Report, plaintiff indicated that he did not need any reminders to take care of personal needs or grooming or to take his medicine, made his own easy meals, could

manage his own money, interacted with others in person on a weekly basis, had no

problems paying attention, could finish what he started, could follow written and spoken

instructions, and had no problems getting along with people in authority.  See id. at 154-

59.  To be sure, plaintiff testified that he avoided strangers, had panic attacks, avoided

talking to people because of his tardive dyskinesia, and could not hold a job because of

his tardiness or failure to show up at work.  See id. at 413-15.  However, plaintiff did not

testify that his activities of daily living were more limited than the ALJ stated, nor did

plaintiff testify to limitations that are consistent with Dr. Babiak's extremely limiting

opinion.  See id. at 413-15, 710-14.[7]

In arguing that the ALJ inappropriately relied on plaintiff's activities of daily living,

plaintiff identifies records which indicate that plaintiff was irritable, tired, did not want to

leave his house, was having anxiety, and had a flat affect and depressed mood.  See

Dkt. No. 11-1 at 17 (citing T. at 280, 284, 286, 289, 320, 352-53).  None of these

records indicate that plaintiff had any functional limitations beyond what the ALJ

determined for plaintiff's RFC.  See T. at 280, 284, 286, 289, 320, 352-53.  Additionally,

the ALJ acknowledged that plaintiff presented with a flat affect and depressed mood,

and that he was anxious and/or irritable.  See id. at 360-61.  The ALJ did not ignore

these records.  Rather, the ALJ concluded that plaintiff's reported activities were

inconsistent with Dr. Babiak's opinion.  The treatment records noting that plaintiff was

depressed, anxious, and/or irritable do not contradict the ALJ's conclusion.  See id. at

---

[7] Dr. Babiak opined that plaintiff would likely miss more than four days of work per month and plaintiff
testified that he cannot hold a job for very long because he would not come into work.  See T. at 415,
714.  This is the only subjective report concerning plaintiff's activities of daily living that appears
consistent with Dr. Babiak's opinion.  Te ALJ rejected Dr. Babiak's opinion on this issue and plaintiff does
not challenge that determination.  See id. at 368; see also Dkt. No. 11-1.

367-38.  As the ALJ's conclusion that Dr. Babiak's opinion is inconsistent with plaintiff's reported activities is supported by substantial evidence, it is another "good reason" to discount Dr. Babiak's opinion.

In sum, the ALJ's reasons for discounting Dr. Babiak's opinion are supported by "substantial evidence" including the other medical opinions, plaintiff's treatment records reflecting medication-controlled symptoms and no side effects, and plaintiff's own Function Report and testimony.  Thus, remand is not warranted on this ground.

## 2.  Whether RFC is Supported by Substantial Evidence

In arguing that the ALJ's decision is not supported by substantial evidence, beyond what has been previously discussed in terms of Dr. Babiak's medical opinion, plaintiff challenges only the ALJ's reliance on Dr. Hymoff's opinion.  See Dkt. No. 11-1 at 18-19.  Plaintiff argues that the ALJ gave too much weight to Dr. Hymoff's medical opinion because Dr. Hymoff "repeatedly testified that he was at a disadvantage in opining on [p]laintiff's mental capabilities and limitations because he had been unable to review [p]laintiff's psychiatric treatment records."  Id. at 18.  The Commissioner argues that the ALJ's RFC determination is supported by substantial evidence because the ALJ relied on plaintiff's relatively conservative treatment history; medical opinions from the consultative examiner, state agency consultant, and Dr. Hymoff; treatment records with "mostly negative clinical findings"; and plaintiff's activities of daily living.  Dkt. No. 13 at 7-13.

During the August 3, 2021, hearing, Dr. Hymoff testified that the record was "certainly incomplete."  T. at 394.  He stated, "we're somewhat handicapped by not having the psychiatric records, but I think [plaintiff] certainly went through a period of

exacerbation of this bipolar condition back in 2016. . . .  I tend to support that he does struggle with this impairment, but I don't see enough evidence for me to say that it meets listing level."  Id. at 400.  He later explained that "usually when you have someone with a bipolar condition, they're, they have to be followed on a regular basis because usually the primary treatment . . . is getting the right medication management."  Id. at 410.  He continued, "[a]nd so, it would be interested to know during the period that we don't have much information on to what degree he was, there was mood fluctuations . . . .  I just don't have a feel for  a lot of that particularly during this period."  Id. at 401-402.  When asked how much time plaintiff might be absent from work or off task, Dr. Hymoff stated that plaintiff would probably miss some degree of work, "[b]ut beyond that period, I have no idea or be able to estimate that because I don't have any – other than the missing psychiatric notes, I have no idea of the stability of the bipolar disorder and the impact it has on functioning."  Id. at 403-403.

In determining plaintiff's RFC, the ALJ gave Dr. Hymoff's assessment "considerable weight because it was based upon his expertise as a licensed psychologist, knowledge of Social Security Act and Regulations requirements, and thorough review of all the medical evidence in the record."  T. at 366.  The ALJ reiterated Dr. Hymoff's testimony and acknowledged Dr. Hymoff's hesitancy with his answers "due to the lack of evidence of the status of [plaintiff's] bipolar disorder and its impact on the claimant's functioning."  Id.  Nevertheless, the ALJ stated that "Dr. Hymoff supported his opinions with references to specific evidence in the record, including [plaintiff's] clinical presentation and treatment history, as well as the assessments from Dr. Long and Dr. Babiak."  Id.

The Court finds no error in the ALJ's consideration of Dr. Hymoff's opinion.  First,

Dr. Hymoff and the ALJ acknowledged that Dr. Hymoff's opinion was less than perfectly

certain because of the missing treatment records from Dr. Babiak.  See T. at 366, 394,

400-401.  However, an expert opinion can only be based on what the expert is provided

and based on that information, Dr. Hymoff testified that plaintiff could perform certain

work.  See id. at 400-401.  Plaintiff cites one case to support his argument that the ALJ

erred in relying on Dr. Hymoff's opinion: Englert v. Colvin, No. 15-CV-564 (FPG), 2016

WL 3745854, at *3 (W.D.N.Y. July 8, 2016).  See Dkt. No. 11-1 at 19.  In Englert, the

court explained that "[a] non-examining, expert medical opinion based on review of a

claimant's incomplete medical history does not offer a basis to find the substantial

evidence necessary to uphold an ALJ's decision in a disability determination."  Englert,

2016 WL 3745854, at *3 (citing Pratts v. Chater, 94 F.3d 34, 38 (2d Cir. 1996)).  The

court concluded that the ALJ's decision was not supported by substantial evidence

because the medical expert's opinion was "the only expert medical opinion testimony

available in this case" and the record contained additional records, which were

submitted after the expert provided his opinion.  Id.  The ALJ relied on those additional

records, without the support of medical expert testimony, to determine the plaintiff's

RFC.  See id. at *4.

Here, the ALJ did not rely solely on Dr. Hymoff's opinion, but the other opinions

from Dr. Long, Dr. Brown, and Dr. Babiak—two of which were examining opinions.  See

T. at 365-68.  Importantly, the ALJ did not give Dr. Babiak's opinion no weight, but "little

weight."  Id. at 368; see also Schillo, 31 F.4th at 78 ("As the ALJ accorded the treating

physicians' opinions lesser and not *no* weight, she still considered their conclusions to

assess [the plaintiff's] RFC.  The ALJ also looked to the other sources in the administrative record, including MRI results, x-ray results, and notes documenting [the plaintiff's] visits with other medical providers.  Using these opinions and data points, the ALJ laid out with specificity [the plaintiff's] physical capabilities.").  Although arguably Dr. Hymoff relied on an incomplete record because of Dr. Babiak's failure to submit them, Dr. Hymoff reviewed all of the treatment records that were available and all of the other medical opinions, including Dr. Babiak's opinion.  See T. at 366-67.  Unlike in Englert, no additional records were submitted after he rendered his opinion.  See Englert, 2016 WL 3745854, at *3-4.

The Court finds no error in the ALJ's reliance on Dr. Hymoff's opinion, in addition to the other opinions and plaintiff's treatment records and testimony.  See Suarez v. Colvin, 102 F. Supp. 3d 552, 578 (S.D.N.Y. 2015) (collecting cases) ("Because [the consultative examiner's] opinion could constitute substantial evidence and was more consistent with the record as a whole than [treating psychologist's and psychiatrist's opinions], [the] ALJ [] did not err in assigning it great weight."); Lenita B. v. Comm'r of Soc. Sec., No. 1:18-CV-6656 (EAW), 2021 WL 4197817, at *6 (W.D.N.Y. Sept. 15, 2021) ("[T]his is not a case where the ALJ arrived at an RFC without relying on any objective medical evidence, or where he incorporated the limitations that were not supported by the record.  Instead, the ALJ here had the benefit of relying on two psychiatric evaluations conducted two years apart by Dr. Kristina Luna, consultative examiner, to formulate [the plaintiff's] RFC.").  As the ALJ's decision is supported by substantial evidence, the Commissioner's decision is affirmed.

### V.  Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**ORDERED**, that the Commissioner's decision is **AFFIRMED**; and it is further

**ORDERED**, that the Commissioner's motion for judgment on the pleadings (Dkt. No. 13) is **GRANTED**, and plaintiff's motion for judgment on the pleadings (Dkt. No. 11) is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve copies of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  May 23, 2023
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge